GULF, COLORADO & SANTA FE RAILWAY COMPANY v.
MAGGIE MATTHEWS ET AL.

Decided January 25, 1902.

**1.—Evidence—Expert Testimony—Railroad Engineers.**

Whether a rapidly moving train, on striking a person standing or walking on the track, would most likely throw him off or run over him, is a question upon which expert testimony by locomotive engineers is admissible, since it lies peculiarly within their knowledge and experience.

**2.—Same—Relevancy—Running Over Person on Track.**

Such evidence was relevant and material upon an issue as to whether the deceased, who was run over by a train, was walking on the track or lying down upon it at the time the train struck him.

**3.—Same—Predicate—Objection to Be Made Below.**

That a proper predicate was not laid for the introduction of expert evidence is an objection that should be made at the time the evidence is offered.

**4.—Negligence—City Ordinance—Violation by Railroad.**

The neglect of the city officials to enforce, in a certain part of the city, an ordinance regulating the rate of speed at which trains should be run, did not excuse its violation there, so as to relieve a railway company from liability for personal injury caused by such a violation at a point where it permits the public to use the track as a highway.

**5.—Same—Knowledge of Ordinance.**

Such violation of the ordinance as to the rate of speed is negligence warranting a recovery for personal injury caused thereby, and that the injured person did not know of the ordinance does not affect the matter.

**6.—Same—Ordinance Not Reasonable.**

Evidence was not admissible to show that the ordinance was unreasonable in its application to the part of the city where the injury occurred, the place being at a point where the railway company had permitted the use of the track by the public as a footway.

**7.—Same—Intoxication—Charge.**

A charge requiring a finding for the railway company if deceased was intoxicated at the time he was struck by the train, without regard to whether his intoxication contributed to the accident, was properly refused.

**8.—Jury—Misconduct—New Trial.**

It was ground for setting aside the verdict that plaintiff's brother, who was looking after the case for her, met a juror pending the trial and had a private talk with him apart, and, being intimate friends, they then took dinner together,

the brother paying for both, while the juror paid for drinks and cigars for both, although they both testified that the case was not mentioned, and it was shown that the juror bore a good reputation.

**9.—Mandate—Inability to Pay Costs—Showing.**

A party owning nonexempt property is not entitled to an order requiring the clerk to issue the mandate without payment of the costs upon a showing that she had not the money with which to pay the costs and can not give security therefor, and has unsuccessfully tried to borrow it on such property, where it does not appear that she has attempted to sell the property, or that it is impossible for her to do so.

Error from Grayson.    Tried below before Hon. Rice Maxey.

*J. W. Terry, Chas. K. Lee,* and *Culver & Hay,* for appellant.

*Wolfe, Hare & Semple,* for appellees.

TEMPLETON, ASSOCIATE JUSTICE.—The defendants in error, who are the wife and minor children of J. L. Matthews, deceased, brought this suit to recover the damages sustained by them on account of his death, which it was alleged was occasioned by the negligence of the plaintiff in error.    On a trial before a jury they obtained judgment for $10,000.

A little after 6 o'clock in the morning of May 8, 1899, a north-bound freight train of the plaintiff in error ran over a man who afterwards proved to be the said J. L. Matthews.    The man was dead when found a few minutes later.    There were no eyewitnesses to the accident except the engineer and fireman of the train.    The accident occurred within the limits of the city of Fort Worth and near the northern boundary thereof.

Matthews had been doing some grading on the road of plaintiff in error near Cleburne, and owned a grading outfit, consisting of the necessary teams and tools.    He quit work, and, leaving his outfit at Cleburne, went to Fort Worth on the day before his death, in company with one Turner.    He went there expecting to get work at a gravel pit, or from the Texas & Pacific Railway Company.    One of his employes was to bring the grading outfit across the country to Fort Worth and meet Matthews at a certain point on Main street about 3 o'clock p. m. on May 8th.

Matthews and Turner separated about 10 o'clock p. m. on May 7th at a lodging house on Main street where Matthews was stopping, agree to meet at 7 o'clock next morning on Front street, near the Union depot, in the southern part of the city, for the purpose of going to look for a camping place for the grading outfit.    It appears from the testimony of a clerk of the lodging house that, some time between 10 and 1 o'clock that night Matthews, after engaging a bed, left the lodging house, saying that he would be back in about an hour.    He did not return, however, and his whereabouts from that time until the accident occurred were not shown.    He was somewhat intoxicated when he left the lodg-

ing house, the evidence being uncertain as to what extent. He was shown to be a man who sometimes drank to excess.

It was the theory of the defendants in error that Matthews had learned of a noted and generally used camping ground which was located a short distance north of the place where the accident occurred, and that he was on his way to look at the same, and that while he was walking along the track he was overtaken and run down by the train. It was shown by the testimony of one witness that a man answering the general description of Matthews passed down the track a little ahead of the train.

It was the theory of the plaintiff in error that Matthews was drunk, and that while going about the city in that condition he became lost and wandered upon the track and fell or laid down, or was assaulted and robbed and his body left there by his assailant. The engineer and fireman testified that they were keeping a sharp lookout and saw and ran over an object lying on the track, but did not know that it was a man until afterwards, though they thought it might be a man. The weather was very foggy that morning, and they testified that on account of the fog they did not discover the object until they were almost upon it and could not be sure what it was. There was an attempt made to impeach the engineer by testimony showing that he had made statements which conflicted in some respects with the testimony delivered by him on the trial. There was evidence to the effect that the body was warm when found, and that fresh blood was flowing from it.

The court instructed the jury to find for the defendant if they believed that Matthews was lying on the track when he was struck by the train, and authorized a recovery by the plaintiffs only in the event that the jury believed that Matthews was struck and killed while walking along the track.

The plaintiff in error offered to prove by one Gumpert that he was a locomotive engineer of thirteen years' experience and had frequently run over animals when the same were walking, standing, and lying on the track, and had run over persons when they were walking and lying on the track; that his experience as an engineer was that in 99 cases out of 100 a person or animal walking or standing on the track would not be run over, but that the cow-catcher would throw them off the track; that this is particularly true as to a train running twenty-five or thirty miles an hour or at a rapid rate of speed; that in his opinion the chances are 99 in 100 that if the train ran over a man on the track he was lying down on it when he was struck. The evidence in this case showed conclusively that Matthews was run over on the track, and that the train was running at a speed of twenty-five or thirty miles per hour when it struck him. The testimony of Gumpert was objected to on the grounds that it was immaterial and irrelevant and called for his opinion on a question upon which he was not entitled to express an opinion, the question not being a proper one for expert testimony. The objection was sustained and the evidence excluded. The plaintiff in error

offered to make the same proof by six other experienced engineers, but the same objections were made to their evidence with like result.

It is clear that the proposed testimony was neither immaterial nor irrelevant. The remaining objection that the question was not a proper one for expert testimony requires more serious consideration. The general rule relating to the admissibility of such evidence is thus stated by Mr. Lawson: "Every employment which has a particular class devoted to its pursuit is an art or trade, and persons instructed therein by study or experience may give their opinion." This language was quoted with approval in Railway v. Thompson, 75 Texas, 501, and it was there held that the business of railroading comes sufficiently within the rule to make the opinions of those engaged in it admissible. This, of course, does not mean that an experienced railroad man may give his opinion as to any and every matter connected with the business. The general rule just stated is qualified by another rule which limits the testimony of the expert to such matters as require technical knowledge to understand. Lawson on Exp. Ev., rule 37. If the uninitiated and inexperienced person can reach a satisfactory conclusion upon the point in question when the facts upon which the conclusion is to be based have been established, then the opinion of the expert is not admissible. But if the conclusion can be drawn only by one having special knowledge or experience in that line of business, the opinion of the specialist is admissible.

In this case, one of the vital questions in issue was whether, when Matthews was struck by the train, he was standing up or lying down. The defendant proved by two witnesses that he was lying down. The plaintiffs introduced evidence tending to show that he was standing up, and attempted to impeach one of the defendant's witnesses. It was conclusively shown that the entire train passed over the dead man. If, as contended by the plaintiffs, the testimony introduced by the defendant on this issue was false, then the position of Matthews at the time he was struck was unexplained, except by circumstances. Thereupon the question arose whether, if Matthews was standing up when struck, he would have been thrown from the track and not run over. The defendant offered to prove by engineers that in their opinion, based upon long experience, a man or animal struck while standing on the track would almost invariably be thrown from the track and not run over. The objection of the plaintiffs was, in effect, that the jurors were as competent as the engineers to decide whether such was the fact. This objection carries with it the idea that the effect of a train striking a person or animal standing or lying on the track is a matter of common knowledge, and that the special knowledge and experience of the engineer is not needed to solve the question. It seems absolutely certain that this proposition is unsound. Suppose the object struck is standing on the track. Will it be thrown directly off? Will it be thrown forward and fall on the track? Will it be thrown upward and fall on the cowcatcher, and if so, will it fall, or be thrown off in front or to one side?

One not learned in the sciences involving the action of physical forces and not experienced in watching the result of such action might speculate upon these questions, but the difficulty of his reaching a satisfactory conclusion upon them is apparent. On the other hand, the experienced engineer, who has witnessed many such events, is in a position to speak with some degree of authority in these respects. If he is qualified to speak, and the jury believes that his opinion is fairly and truly given, his testimony would aid them in arriving at a conclusion. In view of the evidence in this case we think that the testimony of the engineers should have been admitted, and that it was material error to exclude it. This conclusion is clearly in accord with the rules of law governing the admission of such evidence, and is in line with the decision in Cooper v. Railway, 44 Iowa, 141, where it was held that an engineer might give his opinion as to what would be the effect of a backing train striking a cow standing on the track.

The defendants in error suggest in their brief that the proper predicate was not laid. This objection was not urged when the testimony was offered, and we are not called upon to consider it. But even had the objection been interposed at the proper time it is by no means clear that it would have been well taken. According to the theory of the defendants in error the position of Matthews at the time he was struck was wholly unexplained, except that it was their contention that he was either walking or standing on the track. The hypothetical questions asked were, therefore, necessarily general in their nature, and defendants in error could not complain that they were framed to meet the case presented by their contention. A substantial similarity of conditions should, however, be shown by the predicate testimony.

The plaintiff in error had fenced its track at the place of the accident, the fence extending north beyond the city limits. The train had passed the last crossing within the city. A witness testified that the fence was broken so that people could and did pass through. How long the fence had been in that condition, and whether the company knew that fact, was not shown. The company had issued notices warning the public to keep off its tracks and grounds, which notices had been posted at various places along its line of road. The nearest place to the scene of the accident where such notice was posted was at the depot in the southern part of the city, about one and a half or two miles from the point where Matthews was struck. There was testimony to the effect that the track at the place of the accident had been commonly and habitually used by the public for a long time, to such extent and so openly and notoriously that the company either knew or should have known of such use. It was not shown that the company actually consented to the use of its track, but the evidence suggests the theory that it acquiesced therein.

It was made a misdemeanor by the ordinances of the city of Fort Worth to run a train within the limits of the city at a rate of speed greater than six miles per hour, or without continually ringing the bell. The evidence is conclusive that the train was run at a much greater

rate of speed than six miles per hour and was conflicting as to whether the bell was ringing.

The court instructed the jury that if the track at the point of the accident was commonly and habitually used by the public as a footway and the company knew and acquiesced in such use, and if Matthews was struck and killed while walking on the track, and if the train was run in violation of the ordinances of the city relating to the matter of speed or the ringing of the bell, and if the excessive speed or the failure to ring the bell was the cause of the accident, then the plaintiffs were entitled to recover. The plaintiff in error objects to this charge on the ground that, under the facts shown, the ordinances were not applicable to such places as that where the accident occurred, and that in respect to such places they were unreasonable and void. It also offered testimony, which was excluded, for the purpose of showing that the ordinances had never been enforced at the place of the accident, and that the officers of the law who were charged with the enforcement thereof had recognized the right of the plaintiff in error to disregard the same. We are of opinion that the objections of the plaintiff in error are not well taken. As criminal statutes, the ordinances were operative in all parts of the city, and the fact, if it be a fact, that the city officers neglected to enforce them, or even connived at the violation thereof, would not excuse any infringement of the same. The object of the ordinances are manifest. In cities like Fort Worth it is dangerous to human life to operate railway trains at a rapid rate of speed or without proper warning signals, and the ordinances were adopted to protect the public against the danger. Any member of the public lawfully upon the track of a railway company, within the city limits, would be entitled to the benefit of the ordinances, and as to such person a violation of such ordinances would be negligence on the part of the company. Whether the company would owe a duty to a trespasser not to violate the ordinances is a question which is not before us for decision. If, as submitted in the charge under consideration, the track of the plaintiff in error at the point of the accident was commonly and habitually used by the public as a footway with the knowledge and acquiescence of the company, then Matthews was rightfully upon the track, and the same reason existed why the ordinances should be applied at such place as at crossings down town. Neither would the fact, if it was a fact, that Matthews did not know of the ordinances, change the duty which the company owed to him, as a member of the public, to observe the laws which the city had enacted for the protection of the public. The testimony offered by plaintiff in error tending to show how trains were customarily operated at such places and the cost and practicability of operating them at such places in the manner required by said ordinances, and that the ordinances were unreasonable, was not admissible on the issue here considered. If it was burdensome to plaintiff in error to comply with the ordinances at the point where the accident took

place, it had voluntarily assumed the same by assenting to the use of the track at that point by the public.

It was made a misdemeanor by the ordinances of the city for any person to trespass upon the premises of another without his consent. The plaintiff in error insists that Matthews was a trespasser, because he was upon the track in violation of this ordinance. If plaintiff in error acquiesced in the use of its track at that point by the public the ordinance would not apply, for in such case Matthews was not a trespasser.

The special charges asked by the plaintiff in error on the issue concerning the intoxication of Matthews were properly refused, as the same required a finding for the defendant if Matthews was intoxicated, without regard to whether his intoxication contributed to the accident.

Pending the trial of this case in the District Court, one of the jurors, who was afterwards selected as foreman of the jury, and J. W. Woosley, whose mother was a sister of J. L. Matthews, met during a recess of the court. The juror set up the drinks to Woosley. They then had dinner together, Woosley paying therefor. After dinner the juror bought cigars for both. They had a private conversation on the streets, which lasted several minutes. Woosley was looking after and managing the case for Mrs. Matthews. He employed the attorneys for the plaintiffs and went to Fort Worth to look up testimony. He boarded at the same hotel with Mrs. Matthews during the trial. Woosley and the said juror lived at Whitewright, where they were in business. They were intimate friends. They testified that the case was not mentioned; that their meeting was accidental and that their conversation was of a purely social nature. The juror bore a good reputation. These facts were shown on the hearing of defendant's motion for a new trial and were insisted upon as a reason why the motion should be granted. We are of opinion that the point was well made, and that the trial court erred in not sustaining the motion upon that ground.

The importance of guarding a jury engaged in the trial of a cause from improper influences is too well understood to require argument. While Woosley was not a party to this suit and had no pecuniary interest in it, his connection with the case was such that it was manifest impropriety for a juror to exchange courtesies with him. The juror may have been entirely innocent of any wrong intention, and it is even possible that the eating, drinking, smoking, and social intercourse with the kinsman and manager of the plaintiffs did not affect his verdict. However, such conduct was reasonably calculated to do so, and may have done so without the juror knowing it. No matter how innocent the parties may have been, their conduct was improper, and it is impossible to say that injury to the defendant did not result from it. The only safe rule to adopt upon a question like this is to require of the jurors and interested parties such circumspection as will prevent all suspicion of improper influence. The jurors and parties should keep

strictly aloof from each other pending the trial, and if they do not, but meet under circumstances from which injury to the other party may be reasonably apprehended, a verdict for the party engaging in intercourse with the juror can not be sustained. Such a transaction is incapable of explanation. If parties were permitted to excuse improper conduct of this character on the ground that no wrong was intended and probably no injury was done, it would be impossible to draw the line anywhere short of absolute corruption. We are unwilling to lend encouragement to practices which, if tolerated, would undermine the purity and efficiency of our jury system.

The authorities bearing on this question are numerous and somewhat conflicting. In Marshall v. Watson, 40 Southwestern Reporter, 352, the authorities upon which our conclusion is based are collated and reviewed. We concur in the views there expressed, and have found no Texas case which announces a different rule.

It is impracticable and unnecessary to discuss the many assignments of error presented. For the errors indicated above, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

### ON MOTION FOR REHEARING.

At a former day of this term the judgment herein was reversed and the cause remanded. 66 S. W. Rep., 588. The appellee Mrs. Maggie Matthews thereupon filed her affidavit to the effect that she was unable to pay the costs which had accrued in this court, or to give security therefor, and asked that the clerk be required to issue mandate without her being compelled to pay such costs. Appellant contested the motion and filed affidavits in support of its contest. The motion was sustained and appellant has filed a motion for rehearing.

It appears that Mrs. Matthews and her deceased husband owned a homestead and other exempt property. In addition, they owned a lot in Mineola, now worth at least $300, and a lot in Abilene, now worth at least $150. The lots are now owned by Mrs. Matthews and the other appellees, who are the children and heirs of their deceased father. It is shown that Mrs. Matthews has not the money to pay the costs, and that she can not give security therefor. She has tried and failed to borrow the money with which to pay the costs, offering the lots as security. It does not appear, however, that the lots can not be sold. It is clear that the lots could be disposed of at some price. She could unquestionably make title to her undivided one-half interest therein. We are of opinion that when a party is shown to have property not exempt from forced sale, it is his duty to make disposition of it and apply the proceeds on the costs, and that until this has been done it can not be held that he is unable to pay the costs. Of course, if, after the property has been exhausted, any part of the costs remains unpaid, the motion

to issue mandate might be renewed.    Pendley v. Berry, 3 Texas Ct. Rep., 296.

We conclude that the motion for rehearing should be granted, and the motion to require the clerk to issue mandate without the costs being paid should be overruled, and it is so ordered.