**CAMPBELL v. STRUVE et al.**

**No. 8434.**

Court of Civil Appeals of Texas. San Antonio.
May 14, 1930.

Rehearing Denied July 16, 1930.

Nat L. Hardy, of San Antonio, and Walter E. Jones, of Jourdanton, for appellant.

M. A. Childers, of San Antonio, and R. R. Smith, of Jourdanton, for appellees.

SMITH, J.

This is a controversy between W. J. Campbell, plaintiff below and appellant herein, and C. A. Struve, defendant below and appellee herein. The appeal presents the sole contention that appellee and his counsel upon the one hand, and one of the jurors who tried the case upon the other, were guilty of such misconduct as to require reversal of the judgment of the court below.

Appellant's complaint is that appellee and his counsel showed certain favors, during the trial of this cause, to A. J. Hoffman, one of the jurors trying the case. The controlling facts seem to be undisputed. The trial occurred at Jourdanton, county seat of Atascosa county, which is about forty miles from San Antonio, where Judge M. A. Childers, one of the attorneys for appellee, and Nat L. Hardy, Esq., one of the attorneys for appellant, reside. The other attorneys in the case, R. R. Smith, Esq., for appellee, and Earl D. Scott, Esq., and W. E. Jones, Esq., for appellant, reside in Atascosa county, as do the litigants. Juror Hoffman resides at Lytle, in Atascosa county, but in going from Jourdanton to his home at Lytle it is more convenient to go by way of San Antonio. At the close of the second day of this trial, which lasted about three weeks, the case was adjourned over for two days, and the parties and their counsel scattered to their respective homes. Judge Childers and Mr. Hardy returned that evening to San Antonio in Judge Childers' car. They were accompanied by juror Hoffman, who returned to Lytle, by way of San Antonio, and by one Wilson, a witness in the case for appellee. The following statement in appellant's brief seems to fairly state what occurred in this transaction:

"After the adjournment and after the plaintiff and one of his attorneys had left the court room the Juror A. J. Hoffman approached M. A. Childers, Esq., who was conducting the trial of the case for the defendant and asked if he might ride to San Antonio with him in his automobile that afternoon. Judge Childers told him that he could if there was no objection from the plaintiff's attorneys, and turned to Earl D. Scott, Esq., who was of counsel for plaintiff, and in the presence of the juror asked if he objected to the juror taking this ride with him. The exact language used in this conversation is in dispute but Judge Scott told Judge Childers that there was no objection. It then appears that said Juror Hoffman a Mr. Wilson, who was one of the witnesses for defendant, and Nat L. Hardy, Esq. (the latter upon Judge Childers' invitation), who was of counsel for plaintiff, rode to San Antonio from Jourdanton, a distance of about forty miles; that after arriving in the city these parties were left in different parts of the business section, first Mr. Wilson leaving the car, then Mr. Hardy and then Mr. Hoffman. There is no charge that the case was discussed in the presence of the juror. The evidence shows that there is a public motor bus line covering the same route and the fare for the trip is about $1.50."

Summarizing the foregoing statement, it appears that the juror requested and accepted a free ride to San Antonio in the automobile of appellee's attorney, in the company of

said attorney for appellee, as well as of one of the attorneys for appellant and one of the witnesses for appellee. This was done with the knowledge and acquiescence of two of appellant's attorneys, and with the knowledge of the trial judge. Appellant did not complain of the occurrence at the time, or until after verdict and judgment had been rendered against him, or until he incorporated his objection in his amended motion for new trial. It has been often held in this state that a failure of a dissatisfied party to complain of such misconduct at the time it occurs, and until after adverse verdict, has the effect of a waiver of the right to complain, and the judgment rendered on such verdict will not be disturbed on appeal. Wolf v. Wolf (Tex. Civ. App.) 269 S. W. 488; Clark v. Elmendorf (Tex. Civ. App.) 78 S. W. 538; Olivares v. San Antonio & A. P. R. Co., 37 Tex. Civ. App. 278, 84 S. W. 248; Anderson v. Construction Co. (Tex. Civ. App.) 254 S. W. 642. In deference to these decisions and the holdings thereon upon the question of waiver, we hold that the judgment here complained of should not be reversed solely on account of the occurrence in which juror Hoffman rode to San Antonio in Judge Childers' car. Those decisions, however, do not apply to the other transactions complained of by appellant in this appeal, since it is conclusively shown that neither appellant nor either of his counsel knew of the alleged misconduct until several days after the jury had rendered their verdict.

The trial was resumed two days after the journey to San Antonio. Throughout the trial it seems that appellee, the trial judge, some of the attorneys upon both sides, and juror Hoffman, took their meals at the City Hotel in Jourdanton, about five blocks from the courthouse.

Judge Childers generally rode to and from the courthouse and hotel with his client, appellee Struve, in the latter's car. On one day during the course of the trial juror Hoffman rode in appellee's car, with Judge Childers and appellee, from the courthouse to the hotel, where they all had lunch, and after lunch Hoffman rode back to the courthouse in appellee's car, with Judge Childers, R. R. Smith, Esq., who was also one of appellee's counsel, and appellee. Judge Childers testified, upon direct examination by his cocounsel, as follows:

"There is something in this motion about this same juror (Hoffman) having ridden to the Hotel and return. The hotel is about five blocks from the court house. I was taking my meals at the City Hotel during the trial of this case. Judge Scott usually took his noon-day meal at the City Hotel also. I think the plaintiff W. J. Campbell took his meals there some of the time, as well as Jourdan Campbell, his brother. I saw Mr. Jourdan Campbell there every day he was in attendance upon court. I usually rode from the Court House to the Hotel in Mr. Struve's car, as I had a pretty heavy brief case I took along with me with my file and some law books in it. It probably weighed ten or fifteen pounds. I always took it back and forth with me. The juror Hoffman took his meals at the City Hotel also. On the occasion that he rode with me and the defendant, as to how it came about, Mr. Struve and myself had gotten into the car ready to start, and the juror came along by himself and looked at the empty seat in the rear like he wanted to go, and I just opened the door to the back seat and he got in. He passed along within three or four steps of the car without any intention of trying to influence him, I just opened the door and he got in. He rode in the back seat by himself; there was no discussion of the case during that time. I interpreted what was in the mind of the juror when he looked at that back seat; I thought he knew we were going to our meals at the same place he was, and he wanted to ride. Mr. Struve and I did not discuss the case on the way to the hotel, or in returning from the Hotel to the Court House. We did not buy anything for the juror at that time, or at any other time. We did not spend any money on him. We did not do it to obtain his good will in the trial of the case; I merely did it as a matter of ordinary courtesy. He was going to his meals the same place I was, and I just opened the door and he got in; nothing was said. He had his own car here at that time. The trip to the hotel was after the trip to San Antonio. That was probably about six days after the trial began that he rode to the hotel.

"Mr. Hoffman came down to Court originally in a bus, but later I saw him here in his automobile. His car was here at the same time that he rode to the hotel with us.

"We did not invite Mr. Hoffman to ride back. As to how that came about, when we had gotten through eating, I came out on the gallery with you (attorney Smith), as we wanted to talk over some matters concerning the case. Mr. Struve's car was right close to the gallery, and Mr. Struve and I got in the front seat of the car, and you opened the back door to get in, and as you did Mr. Hoffman stepped right in back of you, evidently presuming that he was to make a round trip. We did not discuss the case in his presence. In returning to the Court House on that occasion we turned over by your office and you got out, and then Mr. Struve and I drove on down the main street to the Court House, and we got out and Mr. Hoffman got out and we left him standing there in front of the court house, and we went on upstairs. We never at any time discussed the case in the presence of Mr. Hoffman."

On cross-examination, Judge Childers testified:

"I took my lunch every day at the City Hotel. Judge Murray and Mr. Slatton, and a great many other people took their meals there. Judge Scott took his meals there. I don't recall whether Judge Scott was there in his car that day or not; he usually went to the hotel in his car, but I don't recall about this particular day. Most of the time everybody walked. I rode simply because I had a heavy brief case, as stated before.

"I don't recall any of the other jurors taking their meals at the Hotel. They might have, but I don't recall whether any of the other jurors were there on this particular day or not; I don't remember. I saw several jurors there at another hotel at different times, but I don't know whether any of them took their meals there besides Mr. Hoffman or not, or whether they just came up there. I do not recall any of the jurors except Mr. Hoffman taking meals at the City Hotel.

"On this occasion of the trip to the Hotel, the juror came along and looked like he wanted to ride, and I opened the door and he got in; that is my recollection. I don't think he mentioned the fact that he wanted to ride. * * *

"There was no invitation extended him to ride either in going to the Hotel or in returning to the Court House. When we had finished eating I asked Mr. Smith to come along with us as we wanted to talk with him about the case, and when he came out my recollection is that Judge Scott and some other gentlemen were standing there on the gallery, and was there when the juror got in the car. When Mr. Smith opened the door of the car and got in, Mr. Hoffman got in too. We did not discuss the case, but took Mr. Smith by his office, and then Mr. Struve and I proceeded on to the Court House. We had no intention of inviting him to ride, as we wanted to discuss some matters pertaining to the case. I don't suppose that act of courtesy prejudiced the juror against us, but I don't think it would be calculated to influence him in our favor. I never saw the juror after the trial of the case until last Saturday, when we were down here. I had never seen him before the trial of this case started."

R. R. Smith, Esq., one of the attorneys for appellee, testified on direct examination by his cocounsel, Judge Childers:

"I recall the occasion that the juror Hoffman rode from the City Hotel to the Court House with you, Mr. Struve and myself. We had just gotten through eating dinner, and we walked out on the gallery, and Mr. Struve's car was outside there by the gallery. You had previously mentioned to me that you wanted to discuss some matters pertaining to the case, so you and Mr. Struve got in the car and I opened the door to get in the back seat. At that time Mr. Hoffman was standing there on the steps near the car,

and when I opened the door and got in the car, he stepped down and got in the car also, without saying a word. Judge Scott and several other people were standing there on the gallery not more than ten or fifteen feet from our car. You took me down by my office which is on the route between the Hotel and the Court House, and I got out, and you and Mr. Struve and Mr. Hoffman continued on to the Court House. Nothing was said while I was in the car about the case. No invitation was extended Mr. Hoffman to ride in the car."

Appellee himself testified:

"I recall the occasion during the trial of the case when the juror rode in the car with me and yourself (Judge Childers) to the Hotel. I didn't know what his name was then; I have found out since. I had never known him before. As to how he came to ride with us, you and I had gotten in the car —I was doing the driving, and this man came along and you opened the door and he got in. I did not speak a word to him. I did not at any time invite him to ride with me; I never spoke to him. When we returned from the Hotel he got in and came along with us. I never said a word to him either coming or going, and never extended any invitation to him to ride."

Is is conceded, is obvious from the record, that the three transactions were open and above board, and transpired without design or intention on the part of the parties or their counsel of thereby exercising an influence upon the juror. The well-known character and reputation of counsel preclude any charge or inference of intentional wrongdoing upon their part. But the facts remain, nevertheless that this juror accepted favors of appellee and his counsel upon three separate occasions during the course of the trial, in contravention of the spirit of the law which prohibits communication or unnecessary contact between jurors and litigants and their counsel during the trial of causes. It does not seem to be material that these infractions were induced by the juror, or were thrust by the juror upon appellee and his counsel, or that in the very nature of the case they could not have been avoided by the latter without risking offense to the juror. It may be true, as urged by appellee, that each of the favors shown the juror was but a simple act of common courtesy, although in our opinion the hauling of the juror from Jourdanton to San Antonio constituted a relatively marked favor, by which he was saved bus fare. This transaction was thrust upon appellee's counsel by the juror, and its offensiveness was largely neutralized by the knowledge, acquiescence, and participation of appellant's counsel, and objection thereto was waived, as we have held. But the conduct of the same juror in inviting and accepting the additional favors from the same party

and his counsel amounts, in our opinion, to such a violation of the spirit and policy of the law as to require reversal of the judgment in this cause. Conceding that appellee and his counsel acted in good faith in each of the three transactions, and that the juror was not knowingly influenced in his decision of the case in favor of appellee by the favors shown him, the mind of the juror, without intending any harm, might well have been unconsciously turned in the direction of those who had thus consistently favored him upon the three occasions in question. Gulf, C. & S. F. R. Co. v. Matthews, 28 Tex. Civ. App. 92, 66 S. W. 588, 592, 67 S. W. 788; Palm v. Chernowsky, 28 Tex. Civ. App. 405, 67 S. W. 165; Albers v. San Antonio & A. P. R. Co., 36 Tex. Civ. App. 186, 81 S. W. 828; Gulf, C. & S. F. R. Co. v. Schroeder (Tex. Civ. App.) 25 S. W. 306; Marshall v. Watson, 16 Tex. Civ. App. 127, 40 S. W. 352; First Nat. Bank v. Hix (Tex. Civ. App.) 164 S. W. 1035. In the Matthews Case, first above cited, it was said by a great man and jurist:

"The only safe rule to adopt upon a question like this is to require of the jurors and interested parties such circumspection as will prevent all suspicion of improper influence. Jurors and parties should keep strictly aloof from each other pending the trial, and, if they do not, but meet under circumstances from which injury to the other party may be reasonably apprehended, a verdict for the party engaging in intercourse with the juror cannot be sustained. Such a transaction is incapable of explanation. If parties were permitted to excuse improper conduct of this character on the ground that no wrong was intended, and probably no injury was done, it would be impossible to draw the line anywhere short of absolute corruption. We are unwilling to lend encouragement to practices which, if tolerated, would undermine the purity and efficiency of our jury system."

The judgment must be reversed, and the cause remanded.

### On Motion for Rehearing.

The facts concerning the misconduct of juror Hoffman are undisputed. He asked counsel for appellee to give him a free forty-mile ride from Jourdanton to San Antonio, which he took; at another time he approached appellee and one of appellee's counsel, as they got in the former's car to drive from the courthouse to their hotel for lunch, and by his attitude, but not by words, asked them to let him ride with them, which he did; by the same silent process after lunch he rode with appellee and both of his counsel from the hotel to the courthouse. In the first instance he made his request of counsel in the courtroom, following adjournment of the trial for the day, in the presence of others, among them one of appellant's counsel. Both subsequent transactions were at the noon hour in the presence of the usual courthouse and hotel crowds, with no apparent thought of concealment. Upon neither of the three occasions was the case mentioned. It is conceded by appellant, is apparent from the evidence, was impliedly found by the trial court, and presumed from the high standing of counsel, that there was no intentional impropriety in their conduct; but the degree or nature of the juror's reaction to the occurrences is a matter of the merest conjecture, since his attitude, conduct, or words' in the secret deliberations of the jury, are not disclosed in the record. If in those deliberations he championed the cause of appellee and wrung from the other jurors the verdict they returned for appellee, or if he was silent in those deliberations, and voted for appellee because of the attitude of his fellows, or from an unbiased appraisal of the merits of appellee's cause, is not shown by the record. The entire matter rests in conjecture.

Appellee grounds his motion for rehearing upon the contention that it was within the discretion of the trial court to determine the questions involved in this appeal, and that, under the rule that a trial judge's findings may not be disturbed on appeal except in a clear case of abuse of that discretion, the judgment should be affirmed.

■ The usual question of whether the trial judge abused his discretion in refusing a new trial is not involved, however. The facts set up by appellant as constituting misconduct are undisputed, are frankly conceded by appellee, and therefore did not raise an issue of fact to be resolved by the trial judge within his discretion. On the other hand, the issue of whether those facts constitute misconduct is one of law, determinable by this court, which is not bound by the trial judge's decision thereof. The issue of whether the misconduct was prejudicial to either party is usually one for the trial judge, whose finding will not be disturbed upon appeal, unless it is determined that he abused the wide discretion accorded him in such matters. That issue, however, was not raised by evidence in the trial court whereby the discretion of the trial judge was invoked, but was left wholly to conjecture. The appeal, then, does not involve the matter of the discretion of the trial judge. It is a question of law throughout, which has been relegated to this court.

■ In this situation the majority of this court adhere to this conclusion: That the transactions amount to obvious misconduct upon the part of the juror whereby he sought and obtained favors of and unnecessary contact with appellee and his counsel during the course of the trial of appellee's rights; that, since appellee and his counsel participated in this misconduct, even though thoughtlessly and with no improper intent, appellee assumed the burden of showing that appellant

was not thereby prejudiced, and, failing to meet this burden, appellee will not be permitted to assert that he obtained no advantage by reason of the misconduct.

Appellee's motion for rehearing is overruled.