## ST. LOUIS SOUTHWESTERN RY. CO. OF TEXAS v. GILPIN.

### No. 4491.

Court of Civil Appeals of Texas. Texarkana.

May 31, 1934.

Rehearing Denied June 7, 1934.

Ramey, Calhoun & Marsh, of Tyler, and J. A. Ward, of Mt. Pleasant, for appellant.

Sam Williams and T. C. Hutchings, both of Mt. Pleasant, for appellee.

SELLERS, Justice.

This is a suit by appellee to recover for personal injuries to himself alleged to have occurred while getting off one of appellant's trains at the station at Mt. Pleasant, Tex. The injury alleged was a fracture of the second lumbar vertebra and the displacement of the second and third vertebræ which caused pressure on the motor nerve supplying his legs, thus impairing his ability to move about and to labor and to earn money. Appellant answered by general denial and certain pleas of contributory negligence. From a jury's verdict and judgment in accordance therewith by the court assessing appellee's damages at the sum of $10,000, the appellant has duly prosecuted this appeal.

The ground relied upon by appellant for reversal of this judgment is misconduct of the jury in two particulars, the first of which is the act of the juror Wallace in assisting the appellee down the steps from the courtroom on the second floor of the courthouse to the first floor. This act took place during the progress of the trial and at a noon hour after the appellee had testified and had offered all his evidence in chief, and appellant had only offered one witness in support of its defense. This occurrence took place in full view of one of appellant's attorneys whose testimony with relation thereto is as follows:

"Q. You are one of the attorneys for the defendant in this case? A. Yes, sir.

"Q. At noon when the court recessed and people were leaving the courtroom, the jurors and plaintiff and attorneys, did you see anything happen or occur between the juror Wallace and this plaintiff in this case? A. Yes.

"Q. Please state what it was. A. When I noticed them they were at the top of the stairs of the courthouse and the plaintiff was walking with a cane in his right hand and Mr. Wallace was standing about the top step and he took the plaintiff by the right arm and assisted him down to the landing and across the landing and then on down the next flight of stairs to the bottom of the stairs and I followed them on down to the bottom of the stairs and about two or three steps after they got to the bottom, and I walked around in front of Mr. Wallace and

looked him in the face to be sure it was Mr. Wallace. I was almost sure before that, but I wanted to be sure about it.

"Q. How was the plaintiff walking before he got to the steps? A. He was walking with his stick in his right hand and walking in a stooped position and walking as with difficulty.

"Q. Did you see anybody close to them? A. Yes, sir. I saw Borx Redfearn, the Court Reporter, right behind them and I first called your attention to it and then walked on and called Borx's attention to it and asked him if he saw it and he stated that he did and stated it just like I saw it."

The juror Wallace testified:

"Q. Your name is J. O. Wallace? A. Yes, sir.

"Q. Mr. Wallace, you were a juror in the trial of the case of W. L. Gilpin vs. St. Louis Southwestern Railway Company of Texas, tried here last week? A. Yes, sir.

"Q. On some day at noon during the trial when court adjourned did you assist the plaintiff, W. L. Gilpin, down the stairway? A. I did.

"Q. Here in the courthouse? A. Yes, sir.

"Q. Just state what you did, Mr. Wallace. A. Well, I started out with the rest of them and they were there and I took the man by the arm like I would any other crippled person and walked to the bottom of the stairs with him and he turned to the north door and I came out the east door.

"Q. Why did you do that? A. Just to assist him like I would anybody else and to take the trouble off his wife.

"Q. State whether or not you observed anything about his physical condition while doing that? A. I didn't think anything about it while I was assisting him nor afterwards, either.

"Q. State whether you observed the expressions on his face. When you got him down stairs you turned him loose? A. I turned him loose at the bottom step and he went out the north door and I came out the east door.

"Q. Was anything said between you and Mr. Gilpin? A. No, sir, I never opened my mouth.

"Q. You said it passed out of your mind, when did you next think about it? A. When Mr. Sam Williams asked me about it, it hadn't entered my mind since until after the trial was over.

"Q. Did you notice anything about wheth-

er or not he was nervous? A. No, sir, I didn't.

"Q. The court hadn't instructed you not to do that? A. No, sir, if it had I wouldn't have done it.

"Q. Just state whether or not you did consider that in making up the verdict. A. No, sir, I didn't take hold of him to try to find out anything or to see whether he was nervous, didn't want to, I wasn't interested in him any more than anybody else, I would have assisted any one down stairs that was crippled.

"Q. You took hold of him because he was a crippled man? A. Yes, sir.

"Q. The defendant had not at that time put on any testimony, had it? A. I don't know, I don't remember. I know the case was taken up late Thursday evening and we were turned out at 4 o'clock.

"Q. Do you remember the jury being retired on Friday after dinner? A. Yes, sir, I believe it was.

"Q. Up to that time the defendant hadn't offered any evidence? A. I don't think it had.

"Q. You had determined from the testimony and seeing Mr. Gilpin in the courtroom that he was in fact crippled? A. I knew he was crippled some way, at least I think he was.

"Q. And you reached that from the evidence in the case and seeing him walk around in the courtroom? A. Why, sure.

"Q. And that was the reason you took hold of him and rendered some assistance? A. Yes, sir.

"Q. You never did offer to assist me down the stairs? A. I would have if you were crippled.

"Q. But that fact that he was crippled was what prompted you to do that? A. Yes, sir.

"Q. When you were assisting him could you tell he was crippled by the way he walked and the way he leaned on you in going down, you could tell he was actually crippled? A. I don't know, of course, I took him to be a crippled man.

"Q. That was your opinion that he was crippled and needed assistance? A. Yes, sir.

"Q. And that was your opinion when you got to the bottom of the stairs? A. Well, I don't see how it could have been any other way.

"Q. He did not while going down stairs act so as to cause you to believe he was play-ing off? A. He didn't; he acted like a crippled person to me.

"Q. State whether or not you had seen Mr. Gilpin walking in the presence of the jury prior to this time? A. I never saw Mr. Gilpin until he came in the courtroom.

"Q. You had seen and observed him walking during the trial of the case? A. Yes, sir.

"Q. State whether or not you had any further conviction that he was crippled. A. Not a bit.

"Q. Did the fact that he appeared to be crippled have any effect on you at all? A. Not a bit. I never thought any more about it.

"Q. If you thought he was injured where did you get your information about that? A. In the courtroom from the witnesses."

The appellee testified:

"Q. At the noon hour when court recessed and you went downstairs did any one man take hold of your arm and assist you down? A. Yes, sir.

"Q. Do you know who it was, did you know at that time? A. No, sir.

"Q. You didn't even know it was a juror? A. No, sir.

"Q. You never thought about him being a juror? A. No, sir.

"Q. What did he say, if anything? A. He just told me he would assist me down the steps.

"Q. Was that all he said? A. That was all that was said until we got down to the bottom and started out at the door. I just said, 'It is raining again,' and that was all that was said.

"Q. Now, during the time that person had hold of your arm you were walking in a stooped position and not walking erect? A. Yes, sir.

"Q. You had your cane in your right hand and was walking slowly? A. Yes, sir.

"Q. Did you have any difficulty in walking? A. No, sir.

"Q. You walked without any difficulty at all? A. No, sir; I walked just like I have been walking ever since I was hurt.

"Q. In the same position you have been compelled to walk? A. Yes, sir.

"Q. Did you groan going down the steps any? A. No, sir.

"Q. Were you suffering any pain? A. Yes, sir, I suffer pain all the time.

"Q. Do you know whether or not that

showed in your face or not? A. I couldn't say.

"Q. Now, when you came back into the courtroom this afternoon when you came up did that same man assist you up? A. No sir.

"Q. Who did? A. My son.

"Q. Was that man at the bottom of the steps when you came up? A. I never noticed.

"Q. Do you know whether he was right behind you or not? A. No, sir.

"Q. Isn't it a fact that you have been assisted up those steps right in the presence of the jurors in the trial of this case? A. I guess so.

"Q. Did you walk any different when you were walking down there a while ago than you have walked in the presence of the jury during this trial many times when they could see you and did see you? A. No, sir."

█ This court is familiar and in strict accord with the general rule existing in this state that jurors and parties should keep strictly aloof from each other during the trial of the case, which rule is ably expressed in the case of Gulf, C. & S. F. R. Co. v. Matthews, 28 Tex. Civ. App. 92, 66 S. W. 588, 592, 67 S. W. 788, by Justice Templeton, wherein it is said: "Jurors and parties should keep strictly aloof from each other pending the trial, and, if they do not, but meet under circumstances from which injury to the other party may be reasonably apprehended, a verdict for the party engaging in intercourse with the juror cannot be sustained. Such a transaction is incapable of explanation. If parties were permitted to excuse improper conduct of this character on the ground that no wrong was intended, and probably no injury was done, it would be impossible to draw the line anywhere short of absolute corruption. We are unwilling to lend encouragement to practices which, if tolerated, would undermine the purity and efficiency of our jury system." In giving expression to the above rule it will be noted that the court relied upon the authorities collated in Marshall v. Watson, 16 Tex. Civ. App. 127, 40 S. W. 352, notably among which are two cases by the Supreme Court of Georgia. We mention this because the Supreme Court of Georgia since delivering the opinions relied upon in Gulf, C. & S. F. R. Co. v. Matthews, has held that conduct of a juror identical with that here involved does not constitute such misconduct as will authorize reversal of the case. Central R. & Banking Co. v. Wiggins, 91 Ga. 208, 18 S. E. 187, wherein it is said: "It is no cause for a new trial that one of the jurors took the plaintiff by the arm, and assisted him down stairs, in the courthouse, during a recess of the court, after the trial was commenced, and before it was concluded. It is not apparent or probable that this act of civility on the part of the juror was or might have been prejudicial to the defendant, although the cause of action on trial was an injury to the plaintiff's spine and nerves, which, as he contended, disabled him from walking without crutches or other assistance."

While we do not think the conduct of the juror was entirely proper under the circumstances, in that he should have left the courteous act of assisting the appellee down the stairs to some one else, yet we are far from the opinion that such conduct was sufficient to authorize the reversal of the case. Neither do we think, from the record, that it can be said that the juror secured new evidence from this incident. Surely it will not be contended that the juror secured new evidence from watching the appellee walk down the stairs, for it is shown that he had seen him walking considerably before this incident. It is not contended that there was anything said between the juror and the appellee as they descended the stairs. Then the only thing that happened from which the juror could have secured new evidence was from the act of taking hold of appellee's arm with his hand and assisting him down the stairs, and we fail to see how he could have secured any damaging information from this act; and especially is this true since the juror testified that he had no intention of securing other information with reference to appellee's condition and never thought of the incident again until after the trial when it was mentioned to him by an attorney in the case.

█ The other misconduct complained of is the mentioning of attorney's fees by the jury in their deliberation. The record discloses that some juror, during their deliberation and possibly before the jury had agreed upon the amount of appellee's damages, made the remark, "Wonder what is the usual charge," meaning attorney's fee, when some other juror spoke up and said that they could not consider that. There is no evidence that any juror did take into consideration the amount appellee would have to pay his attorneys in arriving at the amount of his damages. In this state of the record we think it cannot be said the trial court abused its discretion in denying a new trial on this ground. Bradley v. Texas & P. R. Co. (Tex. Com. App.) 1 S.W. (2d) 861.

The judgment of the trial court will be affirmed.