**TEXAS EMPLOYERS' INSURANCE ASS'N,**
**Appellant,**

v.

**Myrtle Ivy McCASLIN et vir, Appellees.**

**No. 7038.**

Court of Civil Appeals of Texas.

Texarkana.

March 25, 1958.

Rehearing Denied April 29, 1958.

Ramey, Calhoun, Brelsford, Hull & Flock, Jack W. Flock, Tyler, for appellant.

Ben Goodwin, Hardy & Odom, Bill Lambert, Tyler, for appellees.

CHADICK, Chief Justice.

This is a workmen's compensation case. The judgment of the trial court is affirmed.

Myrtle Ivy McCaslin, appellee here and plaintiff below, prior to the time of her alleged injury, had been employed by the Crescent Laundry, Inc., at Tyler for over

15 years. In a trial before a jury she obtained a verdict upon special issues for total and permanent disability. After verdict of the jury was returned, but before judgment was entered, the Texas Employers' Insurance Association, compensation insurance carrier, appellant here defendant below, filed a motion for mistrial based upon the misconduct of appellee in communicating with a juror during the trial of the case. The court heard evidence on the motion, overruled it and entered judgment for appellee. An amended motion for new trial was filed and overruled, to which appellant excepted. The order entered overruling the amended motion required the appellee to remit $171.68, and the appellee excepted thereto but nevertheless made the remittitur. No cross-point is brought forward in the last respect.

Appellant seeks reversal on seven points of error. The first point is concerned with the alleged misconduct of the appellee, and the remaining with the submission of an issue upon the wage rate.

The case went to trial on May 6, 1957. The forenoon of that day was taken up with the selection of the jury and about 12:30, after the jury was selected, sworn and instructed in its duties, court was recessed until two o'clock. A lady juror who was employed by a loan company with an office near the courthouse went to her office during this lunch period to do some work. While there, Myrtle Ivy McCaslin, appellee, entered the office and came up to the counter which was about eight feet from the desk where the lady juror was seated, and engaged her in conversation. This juror as a witness at the hearing on the motion for mistrial testified to the nature, substance and effect of this conversation, as follows:

"Q. How did she address you, Miss Morrison? A. Well, somewhere in the conversation, she called me 'Honey.' I don't remember where it was.

"Q. What did she say to you, if anything? A. She asked me about my people that she knew that lived in Missouri, and she said that she wished that she had known how to get in touch with them, she would have liked to have my brother's mother-in-law come down and help her on this case, but she didn't know how to get in touch with them. She asked about my mother and father and how they were, that it had been a long time since she had seen them.

"Q. All right, how did you treat her? A. Pretty cool, because I was scared.

"Q. All right, did that scare you? A. Yes, it frightened me very much.

"Q. And while she was standing there, did she say anything to you with reference to your helping her on this case? A. Not while she was standing there, but when she turned to go out the door, she—

"Q. Just tell the Court what she said to you. A. She said something like, 'Be sure and do all you can to help me.' I am not sure that that was her exact words, but that was the text of it.

"Q. Did you make any reply to that? A. No, I didn't.

"Q. Did it scare you? A. It certainly did.

"Q. What did you do as soon as she had left? A. Well, I just got up from my desk and walked back to Mr. Jackson's office, because he had overheard the conversation, and he told me that he thought I should call the Judge and tell him about it, but I was too upset to call, and I went on back to the rest room.

"Q. How long were you in the rest room? A. I imagine five or ten minutes. I was trying to get myself together.

"Q. All right, and when you came out of the rest room did Mr. Jackson

say anything to you? A. He told me that he had called Judge McKay's office.

"Q. Did you ever call Judge McKay or attempt to call him, yourself? A. No."

Mr. Jackson, responding to the instinct of a good citizen, called the judge's office and reported to the judge's secretary that Mrs. McCaslin had been in the loan office during the noon recess, but that the case on trial was not discussed. He requested that the judge call him. The judge's secretary reported to the judge that Mr. Jackson called and gave him the information that the case was not discussed, and the judge made no effort to return the Jackson call, because he assumed that Mr. Jackson had given his secretary all the information he had in connection with the matter. Shortly after the court reconvened, counsel for appellant and appellee were called into the court's chambers and advised of the information the judge had been given by his secretary. The court and counsel had no additional information as to the occurrence in the loan company office between the appellee and the juror; and the case continued in trial for three days, and on May 8th the jury returned its verdict. About 30 minutes after the jury was discharged, Mr. Jackson telephoned the law office of appellant's counsel and advised counsel in full of the occurrence in his office. Appellant thereupon filed its motion for new trial. After a full hearing at which the lady juror, Mr. Jackson, counsel for the appellant and four of the lady's fellow jurors, including the foreman, testified, the court overruled the motion for mistrial upon the grounds that "It does not reasonably appear from the evidence both on the hearing of the motion and trial of the case and from the record as a whole that injury probably resulted to defendant by reason of the communication made to the juror by the plaintiff."

The trial judge after hearing and considering the evidence, construed Rule 327, Texas Rules of Civil Procedure, as being applicable to the factual situation presented by the record, and concluded that a mistrial was not in order. As applied to this situation the Rule reads: "Where the ground of the motion is * * * (a) communication made to the jury * * * the court shall hear evidence thereof from the jury or others in open court, and may grant a new trial if (he finds) * * * the communication (was) made * * * (and) *it reasonably appears from the evidence both on the hearing of the motion and the trial of the case and from the record as a whole that injury probably resulted to the complaining party.*" (Emphasis supplied.)

The appellant vigorously insists that this is actually a tampering with a jury case rather than a case of jury misconduct in the usual sense of receiving an outside communication. In other words, that the appellee's misconduct so taints and corrupts the action of the jury that a reversal should be had to preserve the inviolability of the jury system. A large number of cases is cited in support of this contention, including St. Louis Southwestern Ry. Co. of Texas v. Gilpin, Tex.Civ.App., 73 S.W. 2d 1054, wr. ref. With the exception of one, which is distinguishable on the facts, all the cases cited where the misconduct of a party communicating with the jury or a juror is the basis of a reversal, occurred prior to the promulgation of Rule 327. The source of the Rule is Article 2234, V.T.C.S. The statute did not contain the language emphasized in the stripped-down rendition of the Rule in the preceding paragraph. Because of this addition it is thought that the cases decided prior to the Rule are not controlling.

The appellee, a 56-year-old woman, while acting within the course and scope of her employment, slipped off a platform and injured her right leg and lower back. She was taken to a hospital within the hour, and operated upon for the injuries within a few days thereafter. The evidence shows her to be a hardwork-

ing person with less than a fifth grade education. When the juror involved underwent voir dire examination prior to selection, she testified that she knew the appellee and had known her for several years. At the hearing on the motion for mistrial the juror testified that appellee owed the loan company by which the juror was employed an account some 10 years delinquent, and to a coolness between her and the appellee of several years duration preceding the trial. This coolness was evidenced by a refusal of appellee to speak to the juror in passing on the street. In this hearing it also was shown that the juror did not initially agree to all answers favorable to the appellee but as to some of them cast an unfavorable vote. However, she eventually agreed to favorable answers to the issues that resulted in a judgment for appellee. The lady juror expected to be questioned by the judge about the communications and when he failed to do so before submission of the case to the jury, she made an effort to communicate to other jurors the approach and conversation that appellee made to her but was warned by the foreman to desist and the matter was not further discussed by the jury. From this factual situation the trial judge could reasonably conclude that the communication of the appellee with the juror did not probably result in injury to the appellant, but on the other hand, that the juror resented the appellee's tactics and, if anything, was less inclined to aid the appellee by reason thereof. The court could quite properly conclude that the fountains of justice had not in fact been defiled and that no actual corruption of the jury, if intended, had been consummated and that denial of a judgment upon an unbiased verdict should not necessarily be the penalty of harboring an unjust but unsuccessful motive. Where the communication to the jury, as here, resulted in no material advantage to the prevailing party the judgment should stand and a violation, if contemptuously done, of the sanctity of the judicial process should be punished by proceedings in contempt or under applicable penal statutes. This conclusion is supported by Watson v. Texas Indemnity Insurance Co., 147 Tex. 40, 210 S.W.2d 989, and Ross v. Texas Employers' Ins. Ass'n, 153 Tex. 276, 267 S.W.2d 541.

The trial court apparently intended to submit the issue of the appellee's average weekly wage in accordance with Subsec. 3, Sec. 1 of Art. 8309. The appellant complains that certain evidence raised an issue making applicable the provisions of Subsec. 2 and that issues should have been submitted to the jury to determine Mrs. McCaslin's average weekly wage rate thereunder. The burden of securing this submission being on appellee and she having failed to do so, appellant contends that under this record she is not entitled to a judgment in any amount.

Appellee's average weekly wage does not seem to have been seriously contested in the trial court. The evidence regarding Mrs. Barnes, a fellow employee of the same class and in similar employment which appellant contends raises such issue, arose in this manner:

"Q. Do you know how many days Mrs. Barnes worked from February 4, 1955, to February 4, 1956? A. No, I don't. I have a record of it, but I couldn't say without looking at the record.

"Q. Do you know whether she worked, from your keeping of the records, can you tell us from your memory as to whether she worked approximately 300 days or about 300 days or a little over 300 days? A. Who do you mean, Mrs. Barnes?

"Q. Mrs. Barnes. A. Yes, I expect she did. She isn't off very much."

Analyzing the answers quoted above, it appears that the first is a positive statement that the witness did not know how many days the employee Mrs. Barnes worked between February 4, 1955

and February 4, 1956. The last answer by this witness indicates that she had an opinion about it. Such opinion has no force as evidence of the fact inquired about. However, it is thought that this is not material in any event as the President of Crescent Laundry testified that Mrs. McCaslin was on a weekly salary of $22.50, and had been for several years. Mrs. McCaslin as a witness for herself also testified that she was paid $22.50 a week for her services. Counsel for appellant as a basis for objection took the position that Mrs. McCaslin was a weekly salaried employee. Under such circumstances, assuming the quoted testimony as being sufficient to show that there were other employees of the same class working substantially the whole of the preceding year, it is thought that as a matter of law it was not necessary to submit an issue upon her weekly wage as the uncontradicted testimony showed that she was a weekly salaried employee to which Subsection 3 is applicable—not an employee on a daily wage. Mrs. McCaslin worked 275½ days in the year preceding her alleged injury and her total pay for that year was shown to be $1,126.99. Applying the provisions of Subsec. 5, Sec. 1, Art. 8309, to her annual pay determines her average weekly wage; that is to say, dividing $1,126.99, by 52 produces $21.48 as her average weekly wage under the formula of the Workmen's Compensation Law. Any error in connection with the issue submitted is harmless. This question is controlled by Texas Employers' Ins. Ass'n v. Clack, 134 Tex. 151, 132 S.W. 2d 399, by the Commission of Appeals. See also Casualty Reciprocal Exchange v. Stephens, Tex.Com.App., 45 S.W.2d 143; Consolidated Casualty Ins. Co. v. Ray, Tex. Civ.App., 267 S.W.2d 880, wr. ref., n. r. e.

All appellant's points of error having been considered and finding that no error requiring a reversal is shown, each point is respectfully overruled.

The judgment of the trial court is affirmed.